IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS D. COLVARD, SR.,<br><br>                    Petitioner,<br><br>          vs.<br><br>SCOTT KERNAN, Secretary, California<br>Department of Corrections and<br>Rehabilitation,[1]<br><br>                    Respondent. | No. 2:15-cv-02475-JKS<br><br>MEMORANDUM DECISION |

Curtis D. Colvard, Sr., a California state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  At the time he filed his Petition, Colvard was in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California Rehabilitation Center.  It appears that he has been released on supervised parole, as a search on the Department of Corrections and Rehabilitation's inmate locator website (http://inmatelocator.cdcr.ca.gov/, Inmate No. F29715) has no record of him.  He has not filed a change of address with this Court.  Respondent has answered, and Colvard has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On June 12, 2013, Colvard, along with co-defendant Matthew Wallace Hayden, was charged with various felony offenses in a six-count amended information.  In count 2, Colvin was charged with possession of an illegal weapon, a "sawed-off shotgun."  In count 4, he was

---

[1]          Because it appears that Colvard has been released from prison but is on post-release supervision, Scott Kernan, Secretary, California Department of Corrections and Rehabilitation, is substituted for Davis Long, former Warden, California Rehabilitation Center. FED. R. CIV. P. 25(c).

charged with being a felon in possession of a firearm, a loaded .357 Magnum revolver. That

count alleged that Colvard was a felon based on a 2005 conviction for assault with a deadly

weapon. The information further alleged as to Colvin a 5-year prior prison term enhancement

based on two prior felony convictions in May 2006 for intimidating a witness and for domestic

violence. On direct appeal of his conviction, the California Court of Appeal recounted the

following facts underlying Colvard's indictment and subsequent conviction:

### The Chase and Its Aftermath

In February 2013 California Highway Patrol Officer Frank Archuleta and
Sacramento County Sheriff's Detective Lizardo Guzman were patrolling a high-crime
area in the early evening. The duo sat in an unmarked truck and wore tactical raid gear
specifying their respective ranks in yellow letters. As they pulled into a motel parking
lot, Guzman saw a Toyota Yaris pulling out. The cars passed one another slowly, about
two feet apart.

[Colvard] sat in the right front passenger seat, garbed in a black puffy jacket with
a red shirt underneath. Hayden, the driver, wore a white T-shirt. The officers turned
their truck around and got behind the Toyota so they could conduct a records check of the
license plate.

As the officers caught up to the Toyota, it ran a red light, almost striking a
pedestrian. Guzman decided to make a traffic stop and activated his lights and siren.
Initially, Hayden began to slow down and pull the Toyota toward the shoulder, but he
suddenly sped away toward the freeway, with Guzman following.

The Toyota entered the freeway going between 80 and 90 miles per hour and
crossed four lanes of traffic. Freeway traffic braked as the Toyota again crossed four
lanes to exit the freeway. As Hayden exited the freeway, the Toyota collided with
cement construction barricades in the middle of the offramp. The pursuit lasted 20 to 30
seconds and covered two and a half miles of the freeway.

As the car left the freeway, Guzman saw [Colvard] throwing orange
prescription-type bottles out the window. After the Toyota crashed into the barricades,
[Colvard] fled from the car. He was now wearing a black sweater. While running away
from the officers, [Colvard] threw a loaded .357 Magnum revolver to the ground in front
of the Toyota. Hayden also got out of the car but was halted by Guzman and a fractured
ankle.

Guzman requested backup, and when reinforcements arrived a perimeter was
established and two canine officers began to search for [Colvard]. One of the police dogs
found [Colvard] hiding close to the crashed Toyota and also located a black sweatshirt
with [Colvard's] cell phone inside the pocket.

Officers found a green duffel bag in the hatchback of the Toyota. Inside the
duffel bag was a loaded sawed-off shotgun, ammunition for the shotgun, ammunition for

2

a .357 Magnum, and a single round for an AK–47.  On the floor of the car officers discovered the black jacket [Colvard] had been wearing with two speed loaders full of .357 ammunition in a pocket.  Officers also found orange-colored prescription bottles like the ones [Colvard] had thrown during the chase; 62–1/2 pills, later ascertained to be methamphetamine; a digital scale; small Ziploc baggies; and a loaded nine-millimeter Ruger semiautomatic handgun with the serial numbers removed.  When officers found Hayden, he was wearing a holster that fit the nine-millimeter Ruger, and he had ammunition for the weapon in his pocket.

### Defense

[Colvard] testified at trial.  He denied owning any of the guns, ammunition, drugs, the duffel bag, or the jacket.[FN3]  He admitted owning the sweatshirt with his cell phone in the pocket.  [Colvard] testified he called Hayden for a ride from the motel, where he had been watching the Super Bowl.  He had spent the night with a woman who was not his wife.  When [Colvard] heard the siren, he asked Hayden to pull over.  As Hayden sped away, he reached over and began throwing the pills and revolver onto [Colvard's] lap.  [Colvard] threw the pills out the window and the nine-millimeter revolver onto the floor.

> FN3.   [Colvard] stated the black jacket was hanging on the seat when he entered the car.

When the Toyota crashed, the .357 handgun was on his lap.  When he got out of the car, [Colvard] threw the gun onto the ground and ran.  [Colvard] ran from the officers because he was on parole and because he wanted to return home to his wife and children.

Hayden did not testify at trial.  Through counsel, he admitted ownership of the nine-millimeter Ruger but denied ownership of the sawed-off shotgun, green duffel bag, or the .357 Magnum revolver.

### Information, Verdict, and Sentencing

A second amended information charged [Colvard] with possession of an illegal weapon, a sawed-off shotgun, and being a felon in possession of a firearm, a loaded .357 Magnum revolver.  The information also alleged [Colvard] was a felon based on his 2005 conviction for assault with a deadly weapon. (§ 245, subd. (a)(1).)  In addition, the information alleged [Colvard] had suffered two prior felony convictions, intimidating a witness and domestic violence, for which he served separate terms in prison and did not remain free of prison custody for a period of five years subsequent to the conclusion of said terms for those two convictions. (§§ 136.1, 273.5, subd. (a), 667.5, subd. (b).)

[Colvard] entered a not guilty plea and denied the enhancement allegations.  Following a jury trial, the jury found [Colvard] guilty on both counts.  [Colvard] admitted the prior conviction enhancements.

The trial court sentenced [Colvard] to six years four months in state prison: the middle term of two years for possession of a sawed-off shotgun, doubled for the prior strike conviction, plus a consecutive one year four months, one-third the middle term of

3

eight months on the charge of being a felon in possession of a weapon, doubled because of the prior strike conviction, plus one year for the prior prison term enhancement.

*People v. Colvard*, No. C074450, 2015 WL 5069029, at *1-2 (Cal. Ct. App. Aug. 27, 2015).

Through counsel, Colvard appealed his conviction, arguing that: 1) the prosecutor committed reversible misconduct; 2) trial counsel rendered ineffective assistance in a number of ways; 3) the trial court failed to provide a unanimity instruction; 4) his admission of his prior convictions violated his *Boykin-Tahl*[2] rights; and 5) the existence of cumulative error warranted reversal of his conviction. The Court of Appeal affirmed Colvard's conviction in its entirety in a reasoned, unpublished opinion issued on August 27, 2015. *Colvard*, 2015 WL 5069029, at *11. Colvard then petitioned for review to the California Supreme Court, raising all claims that he unsuccessfully raised before the Court of Appeal except for his cumulative error claim. The California Supreme Court denied the petition without comment on November 10, 2015.

While Colvard's direct appeal was pending, Colvard also filed in the California Superior Court a *pro se* petition for habeas relief. In that petition, Colvard argued that he was actually innocent, he was denied the right to confront an adverse witness, and trial counsel was ineffective for failing to conduct an adequate forensic investigation of the firearms and items surrounding the firearms. The superior court denied the petition in a reasoned, unpublished decision issued on September 26, 2013.

---

[2]        *Boykin v. Alabama*, 395 U.S. 238 (1969); *In re Tahl*, 460 P.2d 449 (Cal. 1969). Under *Boykin/Tahl*, a conviction may be unconstitutional if the defendant pled guilty without waiving: (1) the right to a jury trial; (2) the right to confront adverse witnesses; and (3) the privilege against self-incrimination. *Boykin*, 395 U.S. at 243; *Tahl*, 460 P.2d at 456-57.

Colvard filed another *pro se* petition for habeas relief in the California Superior Court in which he argued that his 2006 prior conviction, used as a sentence enhancement in the 2013 case, was invalid because he was not informed of his *Boykin-Tahl* rights and that the plea agreement in the 2006 case was violated.  The superior court dismissed the petition in a reasoned opinion issued on May 13, 2014, on the grounds that Colvard could not challenge his 2006 conviction because he was no longer in custody on that conviction.

Colvard then filed in the California Superior Court a *pro se* petition for a writ of error coram nobis, arguing that his 2006 prior conviction was improperly used to enhance his sentence in the 2013 case because he was informed at the time of the 2006 plea that it would not be a strike.  On December 12, 2014, the superior court dismissed that petition as well because he was no longer in custody on the 2006 conviction, and also dismissed the claim on its merits.

Colvard then timely filed a Petition for a Writ of Habeas Corpus to this Court on November 23, 2015.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Colvard raises the following grounds for relief: 1) trial counsel was ineffective for failing to object to the testimony of a detective; 2) the trial court failed to advise him of his *Boykin-Tahl* rights prior to allowing him to admit his prior convictions; 3) the prosecutor committed misconduct by violating a pretrial ruling excluding gang evidence; and 4) the trial court should have sua sponte instructed the jury that they had to agree unanimously on the two firearm counts with which he was charged.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Colvard has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

Ground 1.        *Ineffective Assistance of Counsel*

Colvard first argues that trial counsel was ineffective because he failed to timely object to

"a lengthy, rambling, and highly prejudicial answer of a detective as non-responsive."  In

considering this claim on direct appeal, the Court of Appeal summarized the following facts:

> During defense counsel's cross-examination of Detective Guzman, she asked:
> "I'm also going to show you what's been marked as People's Exhibit 12.  [¶]  Again, is
> this a picture of what you were referring to in terms of laying out evidence for other
> agencies to see?"  Detective Guzman answered: "This picture was taken to forward over
> to our robbery division.  The detective in me says that people with gloves, black
> bandannas, simulated handguns, hoodies—and this is like a fedora type of—beanie type
> of hat—is consistent with that, with what people might use or do use to rob people or
> businesses.  [¶]  So sharing the intelligence of who I arrested and what was found, I want
> to make sure that if there's anything here, may not be relevant to any of the charges that I
> have against both [Colvard and Hayden], may be relevant in an open, unsolved case that
> they were currently working.  This is what that photograph was for."  Defense counsel
> responded, "Thank you.  [¶]  Just to clarify, neither one of these gentlemen was arrested
> for any robbery, correct?"  Detective Guzman replied, "Correct."

*Colvard*, 2015 WL 5069029, at *7.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the

outcome might have been different as a result of a legal error, the defendant has established

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v.*

*United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas

8

petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard. *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Colvard must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Colvard fails to satisfy his heavy burden. As the Court of Appeal reasoned, "In response to the testimony, defense counsel quickly clarified that neither Hayden's nor [Colvard's] arrest was connected with a robbery. Defense counsel made a tactical decision to immediately defuse the testimony and to avoid calling further attention to it by objecting or making a motion to strike." *Colvard*, 2015 WL 5069029, at *7; *see Strickland*, 466 U.S. at 689-90 (reasonable

9

tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim).  Colvard has failed to overcome the strong presumption that his counsel's actions were the result of a tactical decision which this Court may not second-guess. *Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Strickland*, 466 U.S. at 690-91.

Nor can Colvard show prejudice.  Because counsel's chosen method quickly defused the testimony, Colvard fails to show that he would have obtained a better result had counsel objected and moved to strike it, which, as the Court of Appeal noted, would have called further attention to it.  Accordingly, Colvard cannot prevail on his ineffective assistance claim.

Ground 2.    *Boykin-Tahl Violation*

Colvard next contends that, because the trial court accepted his admission of the prior conviction allegations without obtaining intelligent and voluntary waivers of the right against self-incrimination, the right to a jury trial, and the right to confrontation as required by *Boykin-Tahl*, he did not validly waive his right to a jury trial on whether or not he had suffered the alleged prior convictions.  On direct appeal, the Court of Appeal agreed that the trial court had failed to advise him of his *Boykin-Tahl* rights prior to allowing him to admit his prior conviction. *Colvard*, 2015 WL 5069029, at *9.  The court nonetheless found that the error was harmless under the totality of the circumstances, reasoning that:

> [Colvard] understood he had the right to a jury trial on the prior conviction allegations.  He moved to bifurcate, and although the court erred in finding he waived his right to bifurcate, [Colvard] conferred with counsel regarding bifurcation. [Colvard] testified during trial and had been informed of his right to confront witnesses and of the privilege against self-incrimination.  Moreover, he admitted his priors during direct examination.  Under the totality of the circumstances, we find [Colvard's] admission of the prior allegation was voluntary and intelligent.

*Id.* at *10 (citation omitted).

10

The United States Supreme Court has held that, for a guilty plea to be valid, it must be knowing and intelligent; this means that the defendant must be informed that he has the right against self-incrimination, the right to a trial by jury, and the right to confront his accusers, and he must affirmatively waive those rights. *See Boykin*, 395 U.S. 238, 243-44 (1969).  Further, the plea must be given with sufficient awareness of the relevant circumstances and likely consequences. *See Brady v. United States*, 397 U.S. 742, 747-48 (1970) .

But the Supreme Court has not yet decided whether the procedural protections of *Boykin* admonitions extend to prior conviction allegations.  Although the Ninth Circuit held in *Wright v. Craven*, 461 F.2d 1109, 1109 (9th Cir. 1972), that an admission of prior convictions which subjects the defendant to an enhanced sentence is the "functional equivalent" of a guilty plea to a substantive criminal charge which may not be accepted unless the defendant understands the consequences of the admission, the Ninth Circuit subsequently recognized that this was an issue on which the Circuit courts were split, *see Adams v. Peterson*, 968 F.2d 835, 841 n.4 (9th Cir. 1992), *cert. denied*, 507 U.S. 1019 (1993); *see also Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006) ("When the federal circuits disagree as to a point of law, the law cannot be considered 'clearly established' under 28 U.S.C. § 2254(d)(1).").  Accordingly, the Court has no basis to conclude that the California courts' rejection of this claim was either contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam); *Dombrowski v. Mingo*, 543 F.3d 1270, 1276 (11th Cir. 2008) (holding that, because there is no clearly established Supreme Court precedent requiring sentencing courts to either determine that a defendant knows and understands the consequences of his admission to prior convictions for sentence enhancement purposes or to

11

advise a defendant of his Fifth Amendment right against self-incrimination before hearing such

an admission, it cannot be said that a state court's denial of relief was contrary to clearly

established federal law as determined by the Supreme Court), *cert. denied*, 556 U.S. 1246

(2009).

Moreover, even assuming arguendo that *Boykin* does apply to prior conviction allegations

as a matter of clearly established Supreme Court law, the Court concludes that it was not

objectively unreasonable for the California Court of Appeal to conclude that Colvard's

admission of his prior convictions was voluntary and knowing.  *See Adams*, 968 F.2d at 841 n.4,

843 (admission of prior conviction which may subject a defendant to enhanced penalties under a

recidivist statute is valid if it is voluntary and knowing).  Here, the sole basis for Colvard's

contention that his admission of his prior convictions was not knowing is that he was not advised

of all of his *Boykin* rights.  But the mere fact that there was not a specific articulation of all of the

*Boykin* rights prior to Colvard's admission does not render his admission unknowing.  *See*

*Wilkins v. Erickson*, 505 F.2d 761, 763 (9th Cir. 1974) ("*Boykin* does not require specific

articulation of the above mentioned three rights in a state proceeding."); *see also Rodriguez v.*

*Ricketts*, 798 F.2d 1250, 1254 (9th Cir. 1986) ("*Boykin* does not require the state court to

enumerate all of the rights a defendant waives as long as the record indicates that the plea was

entered voluntarily and understandingly.").  Rather, Colvard's admission was knowing if he

made it with sufficient awareness of the relevant circumstances and likely consequences. See

*Brady*, 397 U.S. at 748; *see also Adams*, 968 F.2d at 844.  The record here indicates that Colvard

had experience with the criminal justice system, from which it could reasonably be inferred that

he was aware of the relevant circumstances and likely consequences of his admission.  *See Park*

*v. Raley*, 506 U.S. 20, 37 (1992) ("A defendant's prior experience with the criminal justice system [is] relevant to the question of whether he knowingly waived his constitutional rights.").

Finally, Colvard does not dispute the validity of his prior convictions and does not establish that he would not have made the admission of his prior convictions if he had been explicitly advised of his rights against self-incrimination and to confront and cross-examine the witnesses against him.  Accordingly, the Court finds that the trial court's error, if any, was harmless because it did not have a "substantial and injurious effect or influence" on the judgment.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also, e.g., Lowell v. Prunty*, 91 F.3d 1358, 1359 (9th Cir. 1996) (per curiam) (holding that state trial court's failure to advise petitioner that his admission to prior convictions would add six years to his sentence was harmless error and did not warrant certificate of probable cause to appeal because petitioner did not dispute the validity of his priors) (citing *Brecht*, 507 U.S. at 628-30).  Consequently, Colvard is not entitled to relief on this ground.

Ground 3.    *Prosecutorial Misconduct*

To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to

13

claim of prosecutorial misconduct in summation).  Moreover, a prosecutor must have

"reasonable latitude" to fashion closing arguments.  *United States v. Molina*, 934 F.2d 1440,

1445 (9th Cir. 1991).

Colvard argues that the prosecutor committed misconduct in three respects: by eliciting

gang information, implying that Colvard was with a prostitute at the motel, and

mischaracterizing Colvard's testimony about the Super Bowl.  On direct appeal, the Court of

Appeal described the following facts underlying Colvard's prosecutorial claims and ultimately

dismissed the claims as follows:

### Gang Information

Prior to trial, [Colvard] moved in limine, requesting that the trial court prohibit any mention during trial that prior to the traffic stop, officers suspected [Colvard] might have gang ties.  Specifically, [Colvard] requested no mention be made that the two officers were assigned to the "Gang Suppression Unit" or that they had been interested in [Colvard] because he was wearing a red shirt.  At the hearing on the motion, the prosecutor stated she would admonish the officers not to testify that they were patrolling the area because of gang concerns when they arrested [Colvard].  The trial court also requested that the officers not refer to the gang task force.  The prosecutor agreed.  In addition, the prosecutor agreed not to place emphasis on the color red because of its gang associations.

At trial, Officer Archuleta testified that he was on assignment to the Sacramento Sheriff's Department as part of an "impact team."  When the prosecutor asked if he had a specific assignment, Archuleta responded he had and that he received specialized training for that assignment.  The prosecutor inquired as to the type of training he had relative to the job he was currently doing; Archuleta responded that he was on a team that investigated gang members and the crimes they commit.

The prosecutor asked, "And is it fair to say you also do additional types of investigations or whatever pops up in front of you?"  Archuleta answered yes and testified he had been trained to handle everything from DUI [driving under the influence] crashes and arrests to narcotics and guns.  He also stated they pulled Hayden over because of a Vehicle Code violation: failure to stop at a red light and the near collision with a pedestrian.  Archuleta testified [Colvard] wore a black jacket with a red shirt underneath.

During the following lunch break, defense counsel stated she believed the prosecutor had violated the court's order to not mention anything gang related.  Defense counsel had not objected at the time to avoid drawing further attention to the testimony, making a tactical decision not to say anything.  She requested that the prosecutor caution

14

Guzman prior to his testimony.  Defense counsel stated: "At this point, I just would be asking for no—maybe if Miss Eixenberger [the prosecutor] could remind him not to say anything further.  And then, also, specifically with the other detective that's coming in later, if we could do the admonition at the beginning.  I feel that the cure would be just not to draw attention to it.  Because there's an issue that was not present at the beginning of the trial, when I was asking for the motions in limines [sic], in terms of the jacket and—the black jacket.  The officer now is testifying to something that he didn't write in his report; that we just learned this morning.  And so—[.]"  The court asked, "That being what?"  Defense counsel replied: "Being that he saw [Colvard] wearing the jacket while he was driving.  That's nowhere mentioned in the police report.  It was just mentioned in the police report that they had pulled over this car because they saw the color red.

"And so I didn't want to place emphasis on this being a gang case, because it's not; that being the color red.  I'm worried that—coupled with they are on the gang unit and [Colvard] was wearing red—that a juror may be able to put one and one together, saying that they possibly—one or both of them may be in a gang.

"So I'm just—I've thought it through.  And I think it can be cured, but I just want the other detective to be told."  The court agreed.

The prosecutor responded: "They [the officers] were both told to not speak about [Colvard] . . . and his colors that he was wearing and them believing that he might be in a gang.

"I don't believe it's a violation for him to talk about what his duties are.  He indicated that he does multiple different kinds of stops and that whatever sort of pops up in front of him is what he deals with.  In fact, in this incident there was a Vehicle Code violation right in front of them and that's why they stopped the vehicle.

"And he has additional training above and beyond just a patrol officer, and I believe he can testify about that.  There's—he hasn't said anything about [Colvard] . . . being in a gang or the red drawing his attention because he was in a gang."  The court agreed with this assessment.

However, the court instructed the prosecutor to admonish her next witness consistent with the court's prior order, and the following exchange occurred.  "The Court: . . . I know that when you were asking him questions just about his duties, the part of the task force he's in, the gang stuff came up and then it just kind of—street—street patrol.  So I understand that.

"Do admonish—and I really didn't hear much; that the car was stopped because there was some red in the car.  It was basically a Vehicle Code violation.  The car took off.  So I would admonish your next witness not to say anything.  But what I heard was relatively harmless.

"If, Miss Zettel [defense counsel], you feel that there may be some hint of gang . . . affiliation, I think the best way to handle that with this witness is to just confirm with the witness.  And it may be better done through . . . maybe the prosecution.  'This wasn't a gang-related case.  And the reason for the stop was a Vehicle Code violation; is that correct?'

"Ms. Zettel: That's fine.

"The Court: And not even flag the gang stuff.

"Ms. Eixenberger [prosecutor]: I think the issue, though, is that part of the stop was because they thought he was in a gang.  But I've admonished them to not say that that's why they stopped; that they stopped because of the Vehicle Code violation.

"The Court: Then it might be best just to not say any more and just keep any gang training out of your next witness' repertoire, just because it's not relevant to this case. Okay?"

Detective Guzman testified that he was in a "specialized unit."  Guzman did not use the word "gang" during his testimony.

During her cross-examination of [Colvard], the prosecutor asked: "[W]hat were you wearing?

"[Colvard]: Uh, my black-hooded sweater and jeans.

"[The Prosecutor]: What did you have under your black sweatshirt?

"[Colvard]: I had a red thermal shirt, and I had a white teeshirt over that.

"[The Prosecutor]: Blue jeans?

"[Colvard]: Yes, ma'am.

"[The Prosecutor]: What kind of shoes were you wearing?

"[Defendant]: Some Air Maxes.

"[The Prosecutor]: What color were they?

"[Colvard]: Red."

[Colvard] asserts the prosecutor "would not stop asking Officer Archuleta about his assignment until he referenced gang investigations."  In addition, [Colvard] argues the prosecution's questions regarding [Colvard's] clothing "were clearly intended to impeach [Colvard] by causing the jury to believe that he may be a gang member," and the jury likely "used the well-known fact that red is associated with gang membership to cast [Colvard] in an unfair light while considering his testimony."

Our review of the record does not support [Colvard's] interpretation of events. Officer Archuleta stated only once, briefly and without elaboration, that part of his job involved investigating gang crimes.  He elaborated that his duties involved everything from DUI accidents and arrests to narcotics and guns.  Officer Archuleta testified that he pulled Hayden and [Colvard] over because of a Vehicle Code violation: Hayden's failure to stop at a red light and the near collision with a pedestrian.  The evidence before the jury supported the conclusion that Officer Archuleta stopped Hayden because of his reckless driving, and the pursuit and ultimate arrests stemmed from the traffic stop. Nothing before the jury supported any supposition of gang-related activity.

As for the references to red apparel, nothing before the jury allowed it to infer the color red denoted gang affiliation on [Colvard's] part.  [Colvard] points to no evidence presented at trial that mentions the color red as a gang color.  Instead, [Colvard] posits that the jury "used the well-known fact" that red is associated with gangs.  However, the jury was instructed to consider only the evidence admitted during the trial in reaching its verdict.  We presume the jury followed the court's instruction.  (*People v. Harris* (1994) 9 Cal. 4th 407, 426.)

16

### Prostitution Reference

During his testimony, Detective Guzman stated that the area around the motel in question was a high-crime area known for prostitution and drugs.  Initially, [Colvard], during his cross-examination by Hayden's counsel, denied he had stayed at the motel with a woman.  During cross-examination by the prosecutor, [Colvard] admitted that his wife was not with him for the Super Bowl viewing at the motel.  Instead, he spent the night with a woman named Susan, whom he had met a few hours before.

The prosecutor asked: "You know [the motel] is [in] a high crime area, correct?

"[Colvard]: I do not.

"[The Prosecutor]: You did not know that?

"[Colvard]: No.

"[The Prosecutor]: You don't know that prostitutes hang out there?

"[Colvard]: I'm from Michigan.

"[The Prosecutor]: How long have you lived in Sacramento?

"[Colvard]: I've been here for a minute.

"[The Prosecutor]: How long is 'a minute'?

"[Colvard]: Uh, ten years.

"[The Prosecutor]: You know that prostitutes hang out at that hotel?

"[Colvard]: I do not."

During closing argument, the prosecutor noted that [Colvard] "is a convicted felon with a firearm . . . in that car.  And he also is in an area that you heard was a high crime area, saturated with drugs, guns and prostitutes.  He had no business being in that area or having a gun that day."

[Colvard] argues the references to prostitution amounted to misconduct and served no purpose other than to cause the jury to view [Colvard] with disgust.  However, these remarks were only incidental to [Colvard's] initial denial and subsequent admission that he spent the night at the motel with someone other than his wife, a lack of veracity that undermined his credibility.  Viewed in context, the prosecutor's remarks reminded the jury of [Colvard's] lack of honesty.  Any disgust was a product of [Colvard's] testimony rather than the prosecutor's argument.  We find no misconduct.

### Super Bowl Reference

The testimony surrounding the Super Bowl is rather disjointed and confusing. [Colvard], testifying on his own behalf, explained the reason Hayden picked him up at the motel was because he had been there to watch the Super Bowl.  During cross-examination, the prosecutor asked [Colvard] if he was at the motel on February 4, 2013.  [Colvard] answered in the affirmative.  The prosecutor than asked: "What time did you get there?"  [Colvard] replied, "I got there the day before to watch the Super Bowl." The prosecutor questioned, "So you got there on the 3rd?" and [Colvard] answered, "Yes, ma'am."

The prosecutor asked what time the game started and [Colvard] responded, "I think it started about 5:00 or 6:00 o'clock."  However, the prosecutor pointed out that [Colvard] left at 7:00 o'clock and asked, "So you didn't watch the game?"  [Colvard] responded that he watched some of the game.  When asked who played in the Super

Bowl, [Colvard] answered, "San Francisco and somebody." The prosecutor asked if [Colvard's] friends also stayed overnight at the motel, and [Colvard] testified he did not know because he stayed in another room. Subsequently, the prosecutor asked: "So on February 4th, you . . . left during the middle of the Super Bowl, correct?" [Colvard] said, "Yes, ma'am." The prosecutor further questioned, "And where were you going?" [Colvard] replied, "I was going home."

This testimony created confusion as to which day [Colvard] watched the Super Bowl, February 3 or February 4. The court took judicial notice of the fact that February 4, 2013, was a Monday. During closing argument, the prosecutor argued [Colvard] lied about the Super Bowl because it did not take place on February 4, 2013. Defense counsel argued [Colvard] was not a big football fan, so his answers about the game were not significant. At sentencing, the court mentioned [Colvard] had not been truthful when he testified about viewing the Super Bowl on a Monday.

From the record, the parties and the court were confused as to exactly when [Colvard] claimed to have watched the Super Bowl. The People concede the prosecution may have misunderstood [Colvard's] testimony. [Colvard] contends "[i]t is immaterial if the prosecutor made an honest mistake and misunderstood [Colvard's] testimony" but argues in fact that the prosecutor misrepresented [Colvard's] testimony and such misrepresentations have a major impact on the jury. The misunderstanding resulted in [Colvard's] being made out to be a liar during the prosecutor's closing argument.

We cannot find that the confusion about whether or not [Colvard] watched the Super Bowl the night of his arrest had a "major impact on the jury." [Colvard's] own testimony called his credibility into question. He denied spending the evening with someone other than his wife, then admitted it. [Colvard] claimed not to know the area in which the motel sits, claiming he had only been a resident of Sacramento for "a minute." A minute, [Colvard] acknowledged, was 10 years. His admission to prior felony convictions for assault with a deadly weapon, domestic violence, and witness intimidation wreaked far more havoc on his veracity than any question as to whether or not he watched the Super Bowl. There was no prejudicial prosecutorial misconduct. (*See People v. Osband* (1996) 13 Cal. 4th 622, 706–708.)

*Colvard*, 2015 WL 5069029, at *3-7.

Colvard fares no better on federal habeas review. The Court of Appeal reasonably concluded that the prosecutor's comments were not improper. With respect to his claim that the jury inferred that Colvard was a gang member based on his testimony that he was wearing a red shirt, as the Court of Appeal noted, there was no evidence in the record linking the color red to gang activity, and the jury was instructed to rely on only evidence in the record. This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.

*Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis v. Franklin*, 471 U.S. 307, 323-24 & n.9 (1985) (discussing the subject in depth). Likewise, with respect to his argument that the prosecutor implied that Colvard was with a prostitute, the prosecutor's remarks must be analyzed in the context of the entire proceeding. *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. When viewed in the context of the prosecutor's argument as a whole, the record supports the Court of Appeal's conclusion that no misconduct occurred by the prosecutor's emphasis of Colvard's misleading and untrue statements. Finally, the record fully supports the Court of Appeal's finding that Colvard's other testimony "called his credibility into question," and his "admission to prior felony convictions for assault with a deadly weapon, domestic violence, and witness intimidation wreaked far more havoc on his veracity than any question as to whether or not he watched the Super Bowl." *Colvard*, 2015 WL 5069029, at *7. As such, any potential misunderstanding of Colvard's Super Bowl testimony on the part of the prosecution, which was also referenced by the trial court at sentencing, was harmless.[3]

---

[3]     Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict."). The Court's reliance on Colvard's other testimony and the other negative factors at sentencing in finding that any error was harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case. *Id.* at 904 (citations omitted).

Thus, for the same reasons thoroughly and persuasively articulated by the Court of Appeal, Colvard fails to show that the prosecutor committed prejudicial misconduct. He is therefore not entitled to relief on any argument advanced in his prosecutorial misconduct claim.

Ground 4.      *Instructional Error*

Colvard further argues, as he did on direct appeal, that, because there were three different firearms at issue in his case (a .357 Magnum handgun, a nine-millimeter handgun, and a sawed-off shotgun), the trial court erred in not informing the jury it had to be unanimous as to which firearm Colvard unlawfully possessed.

As an initial matter, the Constitution does not require unanimous agreement on the theory underlying a conviction. *See Richardson v. United States*, 526 U.S. 813, 817 (1999) (federal jury need not unanimously decide which set of facts make up a particular element of a crime); *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (plurality holding that conviction under different theories does not violate due process); *see also McKoy v. N. Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) ("[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." (footnotes omitted)).

While a California trial court may be required under state law mandating that a jury verdict in a criminal case be unanimous to *sua sponte* instruct the jury that it must unanimously agree on the acts underlying the offense in order to convict, federal law is clear that, at least in a non-capital case, there is no federal right to a unanimous jury verdict. *Compare People v. Diedrich*, 643 P.2d 971, 980-81 (Cal. 1982) and *People v. Crawford*, 182 Cal. Rptr. 536, 538

(Cal. Ct. App. 1982) (unanimity instruction required where defendant was charged with possession of one or more firearms by felon and jury could disagree as to particular firearm), *with Schad*, 501 U.S. at 634 n.5 ("a state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict") and *Apodaca v. Oregon*, 406 U.S. 404, 410-13 (1972) (no constitutional right to unanimous jury verdict in non-capital criminal cases).

Consequently, at least in non-capital criminal cases, courts within the Ninth Circuit have routinely dismissed habeas claims arguing that a California "unanimity" jury instruction was required.  *See, e.g., Sullivan v. Borg*, 1 F.3d 926, 927-28 (9th Cir. 1993) (citing *Schad* to find that instruction allowing California jury to convict defendant of first degree murder without unanimity as to whether he had committed felony murder or premeditated murder did not violate petitioner's due process rights); *O'Rourke v. O'Connor*, No. CIV S-09-1837, 2010 WL 4880667, at *6 (E.D. Cal. Nov. 23, 2010).

Because there is no federal law requiring a jury verdict to be unanimous, as with any instructional error, Colvard is entitled to habeas relief only if he can show that the trial court's failure to give a unanimity instruction "so infected the entire trial that the resulting conviction violates due process."  *Estelle,* 502 U.S. at 72 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)).  Where the alleged error is failure to give an instruction, the burden on the petitioner is "especially heavy."  *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).

Colvard cannot satisfy this heavy burden because the record indicates that the prosecutor specifically referenced the weapons it used to satisfy the elements underlying the charge.  As the Court of Appeal stated, "[Colvard] acknowledges that the second amended information, which was read to the jury, stated [Colvard] was charged with possession of an illegal weapon, a

sawed-off shotgun, and being a convicted felon in possession of a firearm, a loaded .357

Magnum revolver." *Colvard*, 2015 WL 5069029, at *8.  Accordingly, the information removed

any possible doubt as to which weapons the jury considered.  Colvard thus cannot show that he

was deprived of a fair trial and is not entitled to relief on this claim.

V. CONCLUSION AND ORDER

Colvard is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: October 24, 2016.

    /s/James K. Singleton, Jr.    <br>
     JAMES K. SINGLETON, JR.<br>
     Senior United States District Judge

22